ATTORNEY FOR THE RESPONDENTS
Terrance L. Smith
Highland, Indiana

ATTORNEYS FOR THE INDIANA SUPREME COURT
DISCIPLINARY COMMISSION
Donald R. Lundberg, Executive Secretary
Robert C. Shook, Staff Attorney
Indianapolis, Indiana



FILED
Mar 11 2009, 1:37 pm
CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 45S00-0606-DI-218

IN THE MATTER OF:

KEVIN W. MARSHALL,

*Respondent.*

No. 45S00-0606-DI-219

IN THE MATTER OF:

C. JEROME SMITH,

*Respondent.*

Attorney Discipline Actions
Hearing Officer Christina J. Miller

**March 11, 2009**

**Per Curiam.**

This matter is before the Court on the report of the hearing officer appointed by this Court to hear evidence on the Indiana Supreme Court Disciplinary Commission's "Verified Complaint for Disciplinary Action" against each of the Respondents, Kevin W. Marshall ("Marshall") and C. Jerome Smith ("Smith"), and on the post-hearing briefing by the parties.  Mar-

shall's 1987 admission to this state's bar and Smith's 1957 admission to this state's bar subject them to this Court's disciplinary jurisdiction.  See IND. CONST. art. 7, § 4.

We find that Respondents Marshall and Smith engaged in attorney misconduct by failing to promptly pay a client the portion of a jury award to which the client was indisputably entitled. For this misconduct, we conclude that Respondents should receive a public reprimand.  We find the Commission has not met its burden of proof with respect to other charges of misconduct.

## Background

Relevant events and procedural history.[1]  Respondents Marshall and Smith are partners in a firm known as Smith and Marshall ("Firm").  In 1999, a client ("Client") retained Marshall to bring suit against two insurance carriers who had denied Client' s claim for losses caused by a fire.  They executed a professional services contract ("First Contract") that required Client to pay a $3,000 initial payment against which the law firm would bill at the rate of $150 per hour. Additional services were to be billed at the same rate but no further payment was required if the lawsuit was unsuccessful (except expenses advanced by Marshall).

Marshall arranged for a focus group to review the facts to be presented to the jury.  The focus group indicated they did not like Client as a witness and showed a verdict range between $0 and $300,999.[2]  Client rejected a final pre-trial settlement offer of $100,000.

In light of the time and expenses already incurred and those anticipated for trial preparation, Marshall told Client in June 2004 (about six weeks before trial) that any verdict of less than $300,000 would be taken by attorney fees unless a change in the employment contract

---

[1] To the extent there are factual disputes, the Court accepts the hearing officer's findings of fact.  We note that the issues on which the parties seek review are primarily issues of law.

[2] Members of the focus group described Client as arrogant, demanding, resentful, greedy, uncooperative, unreasonable, angry, and devious.

was made.[3] Marshall sent Client a new contingent contract ("Replacement Contract") and a copy of the First Contract, and he advised Client to review them with whomever he chose, including any lawyer. The Replacement Contract required Client to pay the Firm one-third of any gross recovery. Although Client told Marshall he was not happy with changing contracts, he reviewed the Replacement Contract, discussed it with his girlfriend, and signed and returned it to Marshall on June 14, 2004.

After the trial, the jury returned a verdict in favor of Client for $1,000,000. On August 13, 2004, Smith and Marshall deposited the insurance carriers' $1,000,000 check into the Firm's trust account. Marshall sent Client a "Settlement Statement" outlining fees and expenses and the expected distribution of the funds. The statement showed $562,235.62 owing to Client. Client disputed the amount of attorney fees due the Law Firm, and Smith assumed responsibility for handling of the fee dispute. Client requested payment of the $562,235.62 by a September 7, 2004, letter to Marshall but received no payment at that time. With the assistance of a Florida attorney, Client requested, among other things, Marshall's hourly billing statements. The Firm did not provide such statements to Client.

After Client filed suit against Smith and Marshall, the parties reached a settlement. On January 21, 2005, Marshall paid $610,000 to Client. The Firm received about $270,000 (plus expenses of about $11,000). Eventually, the amount due to a "public adjuster" was resolved at $25,000, and Client received an additional $75,000.

The Commission filed complaints against each Respondent, alleging violation of these Indiana Professional Conduct Rules (2004), prohibiting the following conduct:

> ➢ Rule 1.8(a): Entering into a business transaction with a client without fully disclosing the terms in writing, giving the client reasonable opportunity to seek independent counsel, and obtaining written consent from the client

> ➢ Rule 1.15(b): Failing to promptly disburse undisputed settlement funds to a client and failing to provide a full accounting to a client.

---

[3] The hearing officer found that from 1999 through June 4, 2004, Marshall expended 2012.7 hours on the case, which would translate into fees of about $302,000 under the First Contract.

After a hearing, the hearing officer issued "Findings of Fact, Conclusions of Law, and Recommendation" in each case. The Commission filed a petition for review by this Court in each case pursuant to Admission and Discipline Rule 23(15)(a). Marshall filed a cross-petition for review.

The hearing officer's conclusions of law regarding the Replacement Contract. The Commission alleged Respondents violated Rule 1.8(a) (2004) by entering into the Replacement Contract with Client without fully disclosing the terms in writing, without giving Client reasonable opportunity to seek independent counsel, and without obtaining written consent from the client. Resolving conflicting evidence on this issue, the hearing officer concluded Respondents did not violate this rule. The Commission does not dispute this conclusion in its petitions for review.

The hearing officer's conclusions of law regarding alleged failure to promptly release funds to Client. The Commission alleged Respondents violated Rule 1.15(b) (2004) by failing to release to Client in August 2004 the amount they calculated was owed him ($562,235.62), waiting instead until January 2005 to pay him anything. The hearing officer found no violation. The Commission challenges this conclusion in its petitions for review.

The hearing officer's conclusions of law regarding alleged failure to give a full accounting. The Commission alleged Respondents violated Rule 1.15(b) (2004) by failing to provide a full accounting to Client of Marshall's hourly billing records. The hearing officer concluded Marshall (but not Smith) violated Rule 1.15 by not providing these records to Client. In his cross-petition for review, Marshall argues he committed no violation because Client was not entitled to these records.

**Discussion**

Obligation to promptly release funds owing to clients. The version of Rule 1.15(b) in effect at the time of Respondents' alleged misconduct provided:

4

> Upon receiving funds or other property in which the client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer **shall promptly deliver to the client** or third person **any funds or other property that the client is entitled to receive**, and upon request by the client or third person, **shall promptly render a full accounting** regarding such property.

Rule 1.15(b) (2004) (Emphasis added.)   These requirements are currently found in the same form in Rule 1.15(d).  Comment 3 to the 2004 version of the rule stated:

> The lawyer is not required to remit to the client, funds that the lawyer reasonably believes represent fees owed. However, a lawyer may not hold funds to coerce a client into accepting the lawyer's contention. The disputed portion of the funds must be kept in a trust account and the lawyer should suggest means for prompt resolution of the dispute, such as arbitration.  **The undisputed portion of the funds shall be promptly distributed.**

(Emphasis added.)  Since 2004, the following provision has been added to Rule 1.15:

> When in the course of representation a lawyer is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved.  **The lawyer shall promptly distribute all portions of the property as to which the interests are not in dispute.**

Rule 1.15(e) (emphasis added).  Thus, the essence of the final sentence of Comment 3 to the 2004 version of the rule has been placed in the rule itself.

Respondents argue they had no legal obligation to make a prompt partial payment to Client because the 2004 version of Rule 1.15 itself did not contain the requirement that the undisputed portion of funds held by attorneys be promptly distributed.  Rather, they argue, because this provision was just in a comment to the rule, it cannot serve as a basis for discipline.

The preamble to the Professional Conduct Rules stated in 2004 and still states:

> Many of the Comments use the term "should."   Comments **do not add obligations** to the Rules but provide **guidance for practicing in compliance with the Rules.**
>
> . . . .

5

The Comment accompanying each Rule explains and illustrates the meaning and purpose of the Rule. . . . **The Comments are intended as guides to interpretation, but the text of each Rule is authoritative.**

Preamble, para. [14] and [21] (2009) (emphasis added). Thus, although Comment 3 itself added no obligation on attorneys, it serves as a guide to interpreting the rule's requirement that "a lawyer shall promptly deliver to the client . . . any funds . . . that the client is entitled to receive."

We hold that the text itself of 2004 version of the rule, as reinforced by Comment 3, required attorneys to promptly distribute undisputed portions of funds they held for clients or third parties. This interpretation furthers a key client protection, expressed in the both the 2004 and current comment 3 to Rule 1.15, that a lawyer may not hold funds to which a client is indisputably entitled to coerce the client into accepting the lawyer's contention in a dispute over attorney fees.[4]

A similar issue was presented in Bennett v. NSR, Inc., 553 N.E.2d 881 (Ind. Ct. App. 1990), in which an attorney moved to quash or modify a subpoena duces tecum requiring him to produce a former client's documents and records over which he asserted an attorney's retaining lien securing payment of his fees. The Court of Appeals held the attorney "should be required to produce those documents and other personal property in his possession over which he claims a retaining lien, but only if the trial court in its discretion **provides for adequate security** for the payment of the fees [the client] owes him." Id. at 883 (emphasis added). Similarly, Respondents were required to turn over to Client the funds indisputably in excess of maximum amount needed to secure payment of attorney fees and other expenses.

When Respondents received the $1,000,000 check, there were unresolved issues about its proper distribution, including which contract controlled how the attorney fees were to be calculated, the number of hours worked by Marshall and another attorney in the Firm (which would have been relevant if the First Contract, with its hourly rate component, controlled), and the amount of fees owing to the public adjuster. When Marshall sent Client the Settlement

---

[4] We do not suggest, however, that Respondents engaged in improper coercion in this particular case. The evidence indicates Respondents made good faith efforts to expedite resolution of the dispute and settled for less fees than they believed they were due.

6

Statement in August 2004 showing $562,235.62 owing to Client, he used the Second Contract (which provided for a pure contingent fee) for the calculation. Although it was possible that Client would have been entitled to less if the First Contract controlled, there seems to be no reason why Marshall could not have calculated and paid Client some amount to which Client would be entitled even if all disputes were resolved against him. The Replacement Contract was signed just a few weeks prior to trial, and Marshall must have been keeping track of his hours for the four years the First Contract was in effect. Marshall presumably could have estimated the maximum amount of hours he and the other attorney worked on the case. With this estimate, plus estimates of maximum possible hours of the other attorney and the maximum possible fee for the public adjuster, Respondents could have calculated the minimum amount Client was indisputably due under either contract. This amount may have been less than the $562,235.62 shown on Settlement Statement, but it would have been clearly more than zero. Respondents' failure to calculate and promptly pay the minimum amount due to Client violated Rule 1.15(b) (2004).

Obligation to give a full accounting. Although the hearing officer concluded that the Replacement Contract (providing for a pure contingent fee) was valid and found Marshall provided "many records" to Client, the hearing officer concluded Client had a right to the hourly billing statements for the period of over four years when the First Contract was in effect.

There is little authority on the scope of an attorney's duty to produce documentation in complying with the duty to render a full accounting to a client. The hearing officer concluded and we agree that the attorney's duty "includes a full accounting of the attorney's billing statements, including hours spent under hourly contracts." Of course, when the parties are operating under a contingent fee agreement, billing statements would typically not include a tally of hours spent as this would be irrelevant to the fee calculation.

Marshall kept hand-written notes of his hours, both before and after the Replacement Contract was executed, which were later transcribed. Under the First Contract, his hours would have been relevant to calculating his fee. After the Replacement Contract was executed, however, Marshall held a well-founded, good faith belief that his hourly billing records were

7

irrelevant to giving a full accounting to Client. The Commission does not challenge the hearing officer's conclusion that Marshall did not act improperly with respect to the Replacement Contract. Under these circumstances, we concluded that Marshall did not violate Professional Conduct Rule 1.15(b) by failing to provide a full accounting to Client.

Discipline. The hearing officer found Respondents acted in good faith and cooperated with the Commission. The Commission does not suggest that either Respondent be suspended from practice. The Court concludes a public reprimand is appropriate under the circumstances.

## **Conclusion**

We find that Respondents violated Professional Conduct Rule 1.15(b) (2004) by failing to promptly release to Client funds indisputably owing to him. For this misconduct, the Court imposes a public reprimand.

The costs of this proceeding are assessed against Respondents equally. The hearing officer appointed in this case is discharged.

The Clerk of this Court is directed to give notice of this opinion to the hearing officer, to the parties or their respective attorneys, to all other entities entitled to notice under Admission and Discipline Rule 23(3)(d), and to Thomson/West for publication in the bound volumes of this Court's decisions.

All Justices concur.